CLERKS OFFICE U.S. DIST. COURT
AT LYNCHBURG, VA
FILED
1/9/2023
LAURA A. AUSTIN, CLERK
BY: s/ ARLENE LITTLE
    DEPUTY CLERK

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF VIRGINIA
LYNCHBURG DIVISION

| | |
|---|---|
| VALERIE DUFORT,<br><br>                  *Plaintiff,*<br>v.<br><br>LIBERTY UNIVERSITY,<br><br>                  *Defendant.* | Case No. 6:21-cv-00054<br><br>MEMORANDUM OPINION<br><br>Judge Norman K. Moon |

    Plaintiff Valerie Dufort alleges that her former employer, Defendant Liberty University, retaliated against her for complaining that Defendant allegedly discriminated against a male Liberty student during its Title IX investigation and for participating in an investigation about the student's complaint of the alleged discrimination. She claims this retaliation violated Title VII of the Civil Rights Act of 1964 ("Title VII") and the Virginia Human Rights Act (the "VHRA"). Defendant moves for summary judgment. The Court will grant Defendant's Motion because Plaintiff was not engaged in protected activity under Title VII and the VHRA.

## Background

    Dufort worked as an investigator in Liberty's Office of Equity & Compliance ("OEC"). Dkt. 23-1 at 67; Dkt. 23-3 ¶ 11. The OEC handles reports of discrimination, harassment, or sexual misconduct from students and employees. Dkt. 23-3 ¶ 8. The OEC investigators conduct initial intake interviews with complainants. *Id.* ¶ 13; Dkt. 23-1 at 83–86, 97. After a case is officially assigned to an investigator, an investigator gathers evidence and interviews the complainant, the respondent, and any relevant witnesses. Dkt. 23-3 ¶¶ 14–15; Dkt. 23-1 at 84–

1

88. After analyzing the evidence, an investigator writes a Draft Investigation Report ("DIR"), summarizing the evidence and the investigator's findings. Dkt. 23-3 ¶ 17; Dkt. 23-1 at 88–89. Before an investigator completes a Final Investigative Report ("FIR"), the complainant and respondent are given an opportunity to review the report and provide any input. Dkt. 23-3 ¶ 17.

On or around April 1, 2019, Dufort conducted an initial intake interview with a male Liberty Student ("Student A"). Dkt. 23-1 at 81; *see* Dkt. 23-2 at 10. He arrived at the interview with "deep scratch marks down his neck" and alleged that his then-girlfriend ("Student B") assaulted him when she became angry with him. Dkt. 23-1 at 82–83. Student A claimed that he pushed her off him in self-defense. *Id.* at 83, 93–94. He produced text messages and emails appearing to show Student B apologizing to Student A for the alleged assault, and he also discussed other violent incidents with Student B. *Id.* at 82–83; *see* Dkt. 23-2 at 11.

Following the initial intake interview, Dufort debriefed Student A's allegations with the OEC Executive Director and Title IX Coordinator Nate Hopkins. Dkt. 23-3 ¶ 19. Hopkins recalls that Dufort told him "she was going to be able to prove that what Student A was saying was true." *Id.* Hopkins cautioned Dufort to not rush to judgment since there appeared to be no witnesses or video footage of the alleged assault, and Dufort had not yet spoken to Student B or any other potential witnesses. *Id.* Dufort denies that she told Hopkins she could prove the case and claims she merely stated she could meet the preponderance of evidence standard. Dkt. 23-1 at 159–60.

Hopkins approved a Title IX investigation to proceed with Dufort as the investigator. Dkt. 23-3 ¶ 20. On April 18, 2019, Dufort interviewed Student B with her attorney. Dkt. 23-1 at 100–01. Dufort recalled that Student B explained her violence as self-defense, but Dufort felt that her answers "were extremely vague." *Id.* at 101. Dufort did not believe that Student A was

the "primary aggressor" in the incident. *Id.* at 102, 120–21.

Following this interview, Dufort told Hopkins that Student B was likely to raise a counter complaint against Student A. *Id.* at 107–08. Hopkins instructed Dufort to incorporate any counter allegation within the original complaint. *Id.* On April 26, 2019, Dufort emailed Student A to schedule a follow-up interview because of Student B's interview. Dkt. 23-2 at 13. In the email, Dufort stated she was "not going to create a counter complaint against" him because of the inconsistencies in Student A's allegations. *Id.*

On May 7, 2019, Dufort emailed Student A asserting that she no longer needed to conduct an interview with him about Student B's self-defense claims. Dkt. 23-1 at 14. On that same day, Dufort emailed her DIR to Hopkins. Dkt. 23-3 ¶ 25.

On May 24, 2019, Student B reviewed the DIR with her attorney. *Id.* ¶ 26. On June 3, 2019, Student B's attorney sent evidence to Dufort that purportedly supported Student B's statements that she acted in self-defense. *Id.* The attorney also requested an interview for Dufort to explain some inconsistencies in her findings. *Id.* On or around June 7, 2019, Student B came in for a follow-up interview, during which she formerly asserted a counter complaint against Student A for his alleged violence toward her during the same incident. *Id.* ¶ 28. Hopkins approved an investigation into her claims. *Id.* ¶ 28; Dkt. 23-1 at 115–16.

Since a counter complaint had been added to the investigation, Hopkins called Student A and asked if he would be interested in mediation through the OEC's Alternative Dispute Resolution process. Dkt. 23-3 ¶ 29; Dkt. 23-1 at 200–03. Student A became upset on the call because Dufort had told him in an email that no counter complaint would be brought against him. Dkt. 23-3 ¶ 29. Hopkins was unaware that Dufort had told Student A this information and asked for Student A to forward him the email. *Id.* ¶ 29.

3

On July 2, 2019, Hopkins emailed Student A and Student B to inform them that Dufort was removed from the case:

> To continue to protect and ensure the integrity of the investigative process, including the neutrality, objectivity, and impartiality of the investigator's role, I have made the decision to assign a new investigator to this matter. Pete Brake has been assigned to handle this matter moving forward, replacing Valerie Dufort, effective immediately. Dufort is screened out of the process and will have no input in the new investigator's determination. Please direct your future communications concerning the investigation to Brake at pmbrake@liberty.edu.

Dkt. 23-3 at 28. Dufort was blind copied on the email, and a "read receipt" notification indicated that she read the email on July 8, 2019. *Id.* at 27.

At a meeting on July 9, 2019, Dufort claims she learned for the first time that she had been removed from the case. Dkt. 23-1 at 153. At this meeting, Dufort expressed concerns about Hopkins' discriminatory treatment of Student A. *Id.* at 154–55.

Dufort continued to have communications with Student A after being removed from the case. She spoke by phone to Student A about the procedure of the Title IX investigation. Dkt. 23-1 at 166–67. Dufort did not inform Hopkins or any OEC employee about her communications with Student A. *Id.* at 165, 182. Student A also blind copied Dufort on emails to other OEC staff. Dkt. 23-3 ¶ 40(a). Dufort never told Hopkins about this, but Dufort claims she did not realize she was blind copied on the emails. Dkt. 23-1 at 217–18.

In or around August 2019, Dufort complained to Hopkins about the discrimination toward Student A during the Title IX investigation. Dkt. 25-3 at 27. Hopkins denied her allegations. *Id.* In the same month, Hopkins met with Liberty's then-Director of Employee Relations Steve Foster about the potential of disciplining Dufort, but he did not explain why discipline was necessary. Dkt. 25-2 at 13–14. After the meeting, Hopkins gave Dufort a verbal disciplinary action in August 2019. *Id.* at 23.

On October 11, 2019, Student A filed a complaint against the OEC, alleging he was a victim of gender discrimination and retaliation stemming from the Title IX investigation. Dkt. 23-2 at 23; Dkt. 23-4 ¶ 5. He alleged the OEC's conduct violated Liberty's Discrimination, Harassment, and Sexual Misconduct Policy and/or Liberty's Employee Handbook. Dkt. 23-4 at 9. Following this complaint, Hopkins canceled all individual meetings with Dufort and limited the information that Dufort received about office business. Dkt. 23-2 at 23; Dkt. 25-2 at 16.

On November 5, 2019, Hopkins met with the Vice-President of Equity and Inclusion Greg Dowell and Executive Vice-President Rob Kennedy to discuss concerns about Dufort's performance. Dkt. 23-3 ¶ 38. They agreed to put Dufort on a corrective review process and to place her on a Performance Improvement Plan. *Id.*

Around this time, Hopkins learned that Student A had filed a complaint against Liberty. *Id.* ¶ 39. In or around November 2019, Liberty hired a third-party attorney, Sean Gibbons, to investigate Student A's complaint. Dkt. 23-2 at 22. Hopkins was asked to collect relevant documentation for the investigation. Dkt. 23-3 ¶ 39.

On November 7, 2019, Liberty's IT Department provided Hopkins with emails between Dufort and Student A. *Id.* ¶ 40. The emails showed that Student A had blind copied Dufort on at least two emails and that Dufort had sent emails to Student A after Dufort had been removed from the case. *Id.* ¶ 40(a); *id.* at 34. Dufort later testified that she never received a ban on communicating with Student A about the investigation. Dkt. 23-1 at 152–53.

On November 11, 2019, Hopkins spoke with Foster about his concerns of Dufort's performance and shared that he wanted to terminate Dufort's employment. Dkt. 23-3 ¶ 41; *see id.* at 30. Foster advised Hopkins to wait until the conclusion of the external investigation. *Id.*

On December 4, 2019, Gibbons interviewed Student A. He told the investigator that

5

Dufort acknowledged he was being treated differently during the Title IX investigation because of his gender and that Hopkins removed Dufort from the case because of bias. Dkt. 23-4 ¶ 8. On December 16, 2019, Gibbons interviewed Dufort. *Id.* ¶ 9. She told him that "she felt that, given the texts from Student B and the photos of injuries to Student A, if a female student had claimed to have been assaulted like Student A, the OEC would have treated the female student differently." *Id.* ¶ 17; *see also* Dkt. 23-1 at 261–62. Dufort believed that Hopkins was informed about the details of her participation in the external investigation. Dkt. 23-1 at 176–77.

On January 21, 2020, Gibbons issued his final investigative report, finding that Student A was not treated differently during the Title IX investigation because of his gender. Dkt. 23-4 ¶ 18; *id.* at 9–26. He noted that "it would have been imprudent for Hopkins to have allowed Dufort to continue to have any involvement in the underlying Title IX investigation given that she had announced, in writing, a bias against one of the parties." *Id.* at 23.

On January 28, 2020, Dufort emailed a complaint to Foster, the then-Director of Employee Relations. Dkt. 23-2 at 23. She complained about Hopkins failing to provide a reason for why she had not been assigned new cases since December 17, 2019. *Id.* She expressed that Hopkins was treating her this way because of her participation in the external investigation on December 16, 2019. *Id.* Foster did not take any steps to address the complaint. Dkt. 25-2 at 17. On February 11, 2020, Dufort reached out again to Foster about her complaint and asked that Hopkins approve a transfer to another position at Liberty. Dkt. 25-4 at 2. Foster again took no action in response to her complaint. Dkt. 25-2 at 17–18.

At a meeting on February 14, 2020, Hopkins and Kennedy issued a Performance Improvement Plan ("PIP") to Dufort. Dkt. 23-3 ¶ 45; Dkt. 23-1 at 233–35. The PIP laid out the expectations for Dufort moving forward. Dkt. 23-2 at 32–36. Dufort signed the PIP form. *Id.* at

6

31. Dufort was prevented from transferring out of the OEC and attending an upcoming training. Dkt. 23-1 at 230–33. At the meeting, Dufort discussed her frustration about Hopkins not telling her why she had not been assigned to new cases. Dkt. 23 at 16 (citing Rec. at 27:15-27:55)).

Following the PIP, Dufort began receiving assignments again, but she found them to be "menial." Dkt. 23-1 at 252–54; 295–96; 300–01. After requesting unpaid leave due to her husband's health issues, Kennedy approved a 30-day leave of absence for Dufort. *Id.* at 281–86; *see* Dkt. 23-2 at 76. Around May 5, 2019, she reported back to work. Dkt. 23-3 ¶ 51. Dufort resigned in June 2019. Dkt. 23-2 at 48.

## **Standard of Review**

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute is genuine if a reasonable [fact finder] could return a verdict for the nonmoving party," and "[a] fact is material if it might affect the outcome of the suit under the governing law." *Variety Stores, Inc. v. Wal-Mart Stores, Inc.*, 888 F.3d 651, 659 (4th Cir. 2018).

The moving party bears the burden of establishing that summary judgment is warranted. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). If the moving party meets this burden, the nonmoving party must set forth specific, admissible facts to demonstrate a genuine issue of fact for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The non-movant may not rest on allegations in the pleadings; rather, she must present sufficient evidence such that a reasonable fact finder could find by a preponderance of the evidence for the non-movant. *See Celotex Corp.*, 477 U.S. at 322–24; *Sylvia Dev. Corp. v. Calvert Cnty, Md.*, 48 F.3d 810, 818 (4th Cir. 1995). The district court must "view the evidence in the light most

favorable to the nonmoving party" and "refrain from weighing the evidence or making credibility determinations." *Variety Stores, Inc.*, 888 F.3d at 659.

## Discussion

### A. Title VII

Title VII prohibits employment discrimination based on "race, color, religion, sex, or national origin," 42 U.S.C. § 2000e–2(a), and its anti-retaliation provision serves to "'prevent[ ] an employer from interfering (through retaliation) with an employee's efforts to secure or advance enforcement of the Act's basic guarantees.'" *DeMasters v. Carilion Clinic*, 796 F.3d 409, 416 (4th Cir. 2015) (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 63 (2006)) (alterations in original). To establish a prima facie case of retaliation, Plaintiff must show that (1) she engaged in protected activity; (2) she suffered an adverse employment action by Defendant; and (3) Defendant took the adverse action because of the protected activity. *Bryant v. Aiken Reg'l Med. Centers, Inc.*, 333 F.3d 536, 543 (4th Cir. 2003); *see Foster v. Univ. of Maryland-E. Shore*, 787 F.3d 243, 249 (4th Cir. 2015).

Plaintiff claims she engaged in protected activity under Title VII by opposing an unlawful discriminatory practice—namely, the OEC allegedly treating Student A differently during its Title IX investigation because of his gender—and by participating in an external investigation about the OEC's alleged gender discrimination of Student A. Dkt. 25 at 23–26. Defendant moves for summary judgment, claiming Plaintiff did not engage in protected activity under Title VII. Dkt. 23 at 19; Dkt. 27 at 1.

Even if the Court assumes all Plaintiff's allegations are true, her activity was not protected under Title VII. Section 704(a) of Title VII's anti-retaliation provision provides:

8

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment . . . because he has opposed any practice made an unlawful employment practice[1] by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e-3(a). An employee thus engages in protected activity when (1) she opposes an unlawful employment practice under Title VII or (2) "participate[s] in any manner in an investigation, proceeding, or hearing" under Title VII. *Id.*; *see Netter v. Barnes*, 908 F.3d 932, 937–38 (4th Cir. 2018).

The Supreme Court and the Fourth Circuit have taken "an expansive view of what constitutes oppositional conduct." *DeMasters*, 796 F.3d at 417; *see Crawford v. Metro. Gov't of Nashville & Davidson Cnty., Tenn.*, 555 U.S. 271, 276 (2009). An employee engages in protected activity when she opposes actions that are "actually unlawful under Title VII" or that she "reasonably believes to be unlawful" under Title VII. *DeMasters*, 796 F.3d at 418 (internal quotation marks omitted).

Plaintiff argues that she engaged in protected oppositional activity when she opposed the OEC's actions because she reasonably believed that the actions constituted unlawful gender discrimination against Student A. Dkt. 25 at 24. However, "Title VII is not a general bad acts statute." *Bonds v. Leavitt*, 629 F.3d 369, 384 (4th Cir. 2011). It "does not prohibit private employers from retaliating against an employee based on her opposition to discriminatory

---

[1] An unlawful employment practice includes: (1) "fail[ing] or refus[ing] to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin;" or (2) "limit[ing], segregate[ing], or classify[ing] his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a).

9

practices that are outside the scope of Title VII." *Id.* Specifically, Title VII does "not prohibit sex discrimination against students; rather, Title IX protects students from sex discrimination" and provides anti-retaliation protections for reporting sex discrimination of students. *Stennis v. Bowie State Univ.*, 716 F. App'x 164, 167 (4th Cir. 2017) (citing 20 U.S.C. § 1681(a)); *see Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 173 (2005). Thus, it was not reasonable for Plaintiff to believe that the perceived discrimination against Student A—who was not an employee—violated Title VII. *See Stennis*, 716 F. App'x at 167 (finding a professor failed to allege that she engaged in protected oppositional activity under Title VII for voicing concerns about students being discriminated against on the basis of their gender and sexual orientation by faculty members).

Moreover, Plaintiff does not allege that she complained about Defendant treating herself or other employees differently because of their race, color, religion, sex, or national origin. *See generally* Dkt. 23-2 at 267–69. While she repeatedly complained about Defendant's alleged discriminatory treatment of Student A, this fails to constitute an actual unlawful employment practice under Title VII because Student A was not Defendant's employee. *See Stennis*, 716 F. App'x at 167. Thus, Plaintiff did not engage in protected oppositional conduct under Title VII.

Plaintiff also did not engage in protected conduct as a participant under Title VII. "Activities that constitute participation are outlined in the statute: (1) making a charge; (2) testifying; (3) assisting; or (4) participating in any manner in an investigation, proceeding, or hearing under Title VII." *Laughlin v. Metro. Washington Airports Auth.*, 149 F.3d 253, 259 (4th Cir. 1998). Plaintiff argues that Defendant retaliated against her after she was interviewed by Gibbons regarding Student A's gender discrimination complaint against the OEC. Dkt. 23-4 ¶ 9. She also claims that she engaged in protected activity when she filed a complaint with

Defendant's then-Director of Employee Relations Steve Foster on January 28, 2020 about Hopkins' alleged retaliation in response to her decision to participate in the external investigation. Dkt. 25 at 26; Dkt. 23-2 at 23. However, she participated in an external investigation about the OEC's alleged discrimination of Student A during its *Title IX* investigation, not a Title VII one. Thus, she fails to qualify as a participant in a Title VII investigation.

### B. VHRA

Plaintiff also brings a claim under the VHRA, Va. Code Ann. §§ 2.2-3905 *et seq.*, for Defendant's alleged retaliatory conduct. Dkt. 1 ¶¶ 33–35. The VHRA makes it unlawful for:

> (i) An employer to discriminate against any employees or applicants for employment . . . because such individual has opposed any practice made an unlawful discriminatory practice by this chapter or because such individual has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter.[2]

Va. Code Ann. § 2.2-3905(B)(7). Because Virginia Code Section 2.2-3905(B)(7) uses almost identical language as Section 704(a) of Title VII's anti-retaliation provision, the Court finds that her VHRA claim fails as a matter of law for the same reasons discussed in Section A.

### Conclusion

The Court will grant Defendant's Summary Judgment Motion, Dkt. 22, because Plaintiff was not engaged in protected activity under Title VII and the VHRA.

---

[2] Chapter refers to "Chapter 39. Virginia Human Rights Act." The VHRA prohibits employment discrimination, Va. Code Ann. § 2.2-3905, and discrimination in places of public accommodation, which includes "all places or businesses offering or holding out to the general public goods, services, privileges, facilities, advantages, or accommodations," *id.* § 2.2-3904(A). The VHRA does not protect students from discrimination.

The Clerk of Court is directed to deliver a copy of this Memorandum Opinion to all counsel of record.

Entered this **9th** day of January, 2023.

/s/ Norman K. Moon
NORMAN K. MOON
SENIOR UNITED STATES DISTRICT JUDGE